```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
_____
                              )
SAMUEL ANTREDU,               )
                              )
               Plaintiff,     )
                              )
           v.                 )     CIVIL ACTION
                              )     No. 22-12016-WGY
MASSACHUSETTS DEPARTMENT OF   )
YOUTH SERVICES,               )
                              )
               Defendant.     )
_____)
```

YOUNG, D.J.                                        April 9, 2024

**MEMORANDUM OF DECISION**

**I.   PROCEDURAL HISTORY**

The plaintiff Samuel Antredu ("Antredu") brought this suit against the Massachusetts Department of Youth Services ("Department") for damages arising from his termination as a Juvenile Justice Youth Development Specialist ("Group Worker") from the Department after his refusal to receive a COVID vaccine due to what he characterizes as a religious objection. See Compl. ¶ 65, ECF No. 1. Antredu also sought reinstatement and back pay. See id. ¶ 88. Antredu brought his claim under section 703(a) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2(a). Id. ¶ 67.

The Department sought summary judgment on Antredu's only count. Def.'s Mot. Summ. J., ECF No. 36. The Department argued

[1]

that Antredu has not: 1) demonstrated a sincerely held religious belief, and 2) that allowing Antredu to continue in his position unvaccinated would have created a substantial burden on the Department's operations.  See Def.'s Mem. Supp. Mot. Summ. J. 6-17, ECF No. 37.  After oral arguments on the motion, this Court granted summary judgment to the Department.  See Electronic Clerk's Notes 2/12/2024, ECF No. 52.

## II.   UNDISPUTED FACTS

The Department is an agency within the Massachusetts Executive Office of Health and Human Services.  Def.'s Statement Mat. Facts ¶ 35, ECF No. 38.  The Department is the juvenile justice agency of the Commonwealth and serves youth between the ages of 12 and 21 whom have been adjudicated delinquent, adjudicated as a youthful offender, or placed in the Department's overnight arrest beds or detention programs while awaiting a future court date.  Id.  The Department employs over 750 full-time employees and 1000 vendor staff in 38 residential programs and 22 community offices supporting a 24-hour, seven-day a week statewide operation.  Id. ¶ 36.  The Department is statutorily mandated to provide treatment for its youth within a rehabilitative, behavioral management model, instead of punitive corrections.  Id. ¶ 37.  The Department houses, feeds, and clothes its clients and provides educational, recreational, vocational, and therapeutic programming for them.  Id.

The Department's residential programs must maintain a minimum staff to client ratio of 1:4 during the day, 1:5 during school hours, and 1:7 at night.  Id. ¶ 38.  Most residential programs within the Department have a capacity of 6 to 15 beds, and youth are always monitored by staff.  Id.

In the fall of 2021, the Department employed Antredu as a Group Worker at the Judge Connolly Youth Center ("Center") in Roslindale, MA.  Id. ¶¶ 59, 61.  Antredu's duties included meeting with youth and providing direct supervision and care to youth, including directing daily activities and assisting youth with education and classroom work.  Id.  Antredu was also responsible for meeting with youth in one-on-one and group settings.  Id.  Antredu was at times required to conduct physical restraints of youth.  Id.  Finally, as a shift supervisor, Antredu was responsible for conducting regular, in-person, one-on-one meetings with subordinate employees.  Id. ¶ 60.  The Center houses between 12 and 15 youth, and between 4 and 6 staff are always present at the Center, as well as other clinical, medical, culinary, transport, and security staff.  Id. ¶ 62.

In the fall of 2021, the Commonwealth was under siege by the COVID-19 pandemic.  Id. ¶ 4.  COVID-19 is an infectious and contagious disease that can cause serious disease, hospitalization, and death.  Id. ¶ 1.  On August 19, 2021,

[3]

Governor Baker of the Commonwealth of Massachusetts issued Executive Order 595 ("the Order").  Id. ¶ 22.  The Order explained that vaccination was the most effective tool for combatting COVID-19 and ordered all executive department employees to show that they had received COVID-19 vaccination by October 17, 2021.[1]  Id. ¶ 23-24.  The Order also required that state agencies implement a procedure to allow exemption from the vaccination requirement where a reasonable accommodation could be reached for any employee not able to receive vaccination due to medical disability or a sincerely held religious belief.  Id. ¶ 25.

In compliance with that Order, the Human Resources Division for the Executive Branch issued a Vaccination Verification Policy for all executive agencies, including the Department.  Id. ¶ 28.  Upon receiving a request for a religious exemption, Diversity Officers in each executive agency, based on specific training, were asked to conduct an "interactive dialogue" to allow the employee to demonstrate how their sincerely held religious belief conflicted with the COVID-19 vaccination mandate.  Id. ¶ 57.  Following that interactive dialogue, the Diversity Officer would review the employee's job description,

---

[1] Antredu disputes that vaccination against COVID-19 will "prevent infection" or "prevent against transmission."  Pl.'s Opp'n Mot. Summ. J. 11.  This disagreement, however, does not factor into the Court's analysis.

would speak to the employee's manager as necessary to confirm the employee's role and to review their work environment, and would determine whether an accommodation could be made without an undue hardship to the agency. Id. ¶ 58.

On September 23, 2021, Antredu requested an exemption from the COVID-19 vaccination requirement based on his purported religious beliefs. Id. ¶ 68. In his request, Antredu stated the following:

> The Bible teaches me that my body is the temple of God . . . . I believe that I must protect my body, and keep it holy, and that I must not put any harmful substances into my body, nor take any action that unnecessarily risks my health. This is a belief that I observe daily in my choice of diet (plant base only), as well as engaging in other health practices. . . . [T]he Bible also teaches me about the sanctity of life, specifically that life begins at conception and that I must not endorse the killing of human life by anything I participate in. It is my understanding that most or all of the COVID vaccines contain cell lines or utilized cell lines derived from aborted human being in the manufacture and testing of the vaccine. It is my sincere belief that for me to benefit from the murder of innocent human life is immoral and a sin. . . . I have taken the matter to the Lord in prayer and am convicted that I should not take the vaccine and that to do so would violate my conscience.

Pl.'s Opp'n Mot. Summ. J., Ex. 3, Antredu Request Form, ECF No. 46-3.

Upon receipt of Antredu's request, Pete Murillo ("Murillo"), the Department's Deputy Diversity Officer/ADA Coordinator, reviewed Antredu's request and contacted him by

[5]

email to engage in an interactive dialogue.  Def.'s Statement Mat. Facts ¶¶ 69-70, ECF No. 38.  When asked to explain his religious beliefs further, Antredu stated:

> [H]ealth reform is part of what the church teaches which I believe in and practice. Because of such teachings I do not [drink] alcohol/wine or consume anything that contains caffeine, also I do not smoke. On the Health Reform, there is an acronym NEWSTART ie 1.Nutrition 2.Exercise 3. Water which I consume 2.3 liters of according to my weight every day, which my colleagues and supervisors can attest to it 4. Sunlight 5.Temperance, making wise decision in accordance to my beliefs and health 6. Air 7. Rest and 8. Trusting in God.  I have incorporate these principles in my life.  And this beliefs conflict with the requirement to receive the vaccination because of the coercion.

Def.'s Statement Mat. Facts, Ex. 7, Murillo Decl. ¶ 9, ECF No. 38-7.  Antredu further explained that his beliefs stemmed from his practice as a Seventh Day Adventist.  Def.'s Statement Mat. Facts, Ex. A, Murillo Decl., ECF No. 47.  Antredu requested that in lieu of vaccination he be allowed to conduct his work while wearing a mask and testing periodically for the virus.  Def.'s Statement Mat. Facts ¶ 72, ECF No. 38.

Following the communication with Antredu, Murillo consulted with the Department's Diversity Officer and reviewed Antredu's position and work location in the context of his request.  Id. ¶ 75.  On October 8, 2021, Antredu received a response letter from the Department stating that Antredu had "successfully demonstrated [his] sincerely held religious belief," but that

his request for an exemption from the vaccination mandate was denied "because [his] request poses an undue hardship for the agency." Pl.'s Opp'n Summ. J., Ex. 2, Accommodation Denial Letter, ECF No. 46-2.

Due to his refusal to receive COVID-19 vaccination, on February 15, 2022, the Department suspended Antredu without pay for five days, and then, on February 22, 2022, for ten more days. Compl. ¶ 63. Antredu was told that he could end his suspension by receiving COVID-19 vaccination. Id. Antredu did not, and at the end of the 10-day suspension, the Department terminated Antredu's employment. Id.

The Department deposed Antredu, in the present action, to discuss his claim of religious discrimination. Def.'s Statement Mat. Facts, Ex. 6, Antredu Dep., ECF No. 38-6. When asked if he believed that COVID-19 vaccines were effective in preventing people from contracting COVID-19, Antredu stated that they were not 100% effective, but that he "[didn't] know if it's a belief, it's just -- [he] think[s] how [he] understand[s] nature as it is." Id. 44:7-24. Antredu also further explained the NEW START philosophy, stating that his health is "very important" to him. Id. 34:9.

**III. ANALYSIS**

    **A.   Standard of Review**

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.

The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish

a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

**B.  Discussion**

The First Circuit applies a two-part framework in analyzing religious discrimination claims under Title VII.  "First, [a] plaintiff must make [his] prima facie case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action."  Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004); see also Lowe v. Mills, 68 F.4th 706, 719 (1st Cir. 2023).  "[T]he burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship."  Cloutier, 390 F.3d at 133.  To qualify as a bona fide religious practice, a plaintiff must show "both that the belief or practice is religious and that it is sincerely held."  Equal Emp. Opportunity Comm'n v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 56 (1st Cir. 2002).

**1.  Sincerely Held Religious Belief**

Antredu argues that because the Department stated in its letter denying his accommodation that he had "successfully demonstrated [his] sincerely held religious belief," the Department is now estopped from denying that Antredu's belief is

[9]

sincerely held.  Pl.'s Opp'n Mot. Summ. J. 1, ECF No. 46.  The Department's statement in its response letter, conceding that Antredu's religious belief is sincerely held, is a party admission and due substantial weight.  The Department, however, argues that Antredu "cannot establish his prima facie case of religious discrimination" because Antredu's objection was "based on a secular, rather than religious, tenet."  Def.'s Mem. Supp. Mot. Summ. J. 7-9, ECF No. 37.

The Court is charged with determining "whether [P]laintiffs' assertions constitute religious beliefs -- as opposed to philosophical, medical, or scientific beliefs, or personal fears or anxieties." Together Emps. v. Mass General Brigham, Inc., 573 F.Supp.3d 412, 440 (D. Mass. 2021) (Saylor, C.J.), aff'd, 32 F.4th 82 (1st Cir. 2022).  "A stated claim of religious belief, without more, cannot grant an individual a blanket privilege to make his own standards on matters of conduct in which society as a whole has important interests." Griffin v. Massachusetts Dep't of Revenue, No. CV 22-11991-FDS, 2023 WL 4685942, at *6 (D. Mass. Jul. 20, 2023) (Saylor, C.J.) (internal quotations omitted).  Courts have held that plaintiffs have failed to demonstrate sincerely held religious beliefs when their beliefs are instead based on "expressions of personal belief" instead of religious practice.  See, e.g., Brox v. Hole, 590 F. Supp. 3d 359, 366 n.7 (D. Mass. 2022) (Stearns, J.),

aff'd in part, vacated in part, remanded, 83 F. 4th 87 (1st Cir. 2003); Griffin, 2023 WL 4685942, at *7; Fallon v. Mercy Cath. Med. Ctr. of Se. Pa., 877 F.3d 487, 488 (3d Cir. 2017); Farina v. Board of Educ., 116 F. Supp. 2d 503, 508, 513 (S.D.N.Y. 2000); Sherr v. Northport-East Northport Union Free Sch. Dist., 672 F. Supp. 81, 95-96 (E.D.N.Y. 1987); NM v. Hebrew Acad. Long Beach, 155 F. Supp. 3d 247, 258-59 (E.D.N.Y. 2016); Caviezel v. Great Neck Pub. Sch., 701 F. Supp. 2d 414, 429-30 (E.D.N.Y. 2010), aff'd, 500 F. App'x 16 (2d Cir. 2012).

Although the Court is cautious in ascribing a religious or non-religious character to another's beliefs, it is unlikely that a reasonable juror would find Antredu's statements regarding the "NEW START" philosophy to which he ascribes as anything other than "expressions of personal belief," rather than sincerely held religious beliefs.  Brox, 590 F. Supp. 3d at n.7;[2] see also Fallon, 877 F.3d at 488 ("[Plaintiff] simply

---

[2] The Court in Brox explained:

> The reasons offered by plaintiffs in explaining their opposition to the Policy have no grounding in religious practice but are rather expressions of idiosyncratic personal belief.  They include: "Jesus tells me that it is unwise to put the COVID vaccine into my body, his creation;" "I am afraid that it will kill me;" "Using genetically engineered envelopes such as mRNA that has shown ineffectiveness to work as intended to trick our bodies to fight somethings [sic] that we were made to defend goes against why God created us the way He did;" "I believe my God will

worries about the health effects of the flu vaccine, disbelieves the scientifically accepted view that it is harmless to most people, and wishes to avoid this vaccine. . . . [H]is concern that the flu vaccine may do more harm than good -- is a medical belief, not a religious one."). Antredu's feelings regarding the use of fetal cell lines, however, are likely a clear demonstration of sincerely-held religious belief, and the Court refuses to characterize them otherwise.

"Title VII's 'capacious definition' of religion 'leaves little room for a party to challenge the religious nature of an employee's professed beliefs,' and that sincerity depends on a fact-intensive assessment of credibility."  Together Emps., 573 F. Supp. 3d at 441.  When presented with objections to vaccination based on the use of fetal cell lines, multiple courts have determined that plaintiffs' religious beliefs are sincerely held.  See id.; see also Lowe v. Mills, No. 1:21-CV-00242-JDL, 2022 WL 3542187, at *7 (D. Me. Aug. 18, 2022), aff'd in part, rev'd in part and remanded, 68 F.4th 706 (1st Cir. 2023), cert. denied, 144 S. Ct. 345 (2023); Tropical Chill Corp. v. Pierluisi Urrutia, No. CV 21-1411 (RAM-MEL), 2022 WL 2374976,

---

       guide me and protect me and [God] has told me not to get the vaccine at this time;" "I worship nature and believe in the use of natural medicine to keep myself healthy;" and "I have a strong belief thant [sic] natural & ancient remedies are what God intended me to use, to prevent and help cure illness.

at *22 (D.P.R. Jan. 17, 2022), report and recommendation adopted, No. CV 21-1411 (RAM), 2022 WL 2712538 (D.P.R. July 13, 2022). Considering Antredu's statements in his request for an exemption regarding his views on the sanctity of life, and considering the Department's admission that Antredu's beliefs are sincerely held, the Court ruled that Antredu has established a prima facie case.

### 2. Undue Hardship from the Requested Accommodation

The Court was now tasked with deciding whether the Department has demonstrated "that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." Cloutier, 390 F.3d at 133. "[I]n common parlance, a 'hardship' is, at a minimum, 'something hard to bear.'" Groff v. DeJoy, 600 U.S. 447, 468-69 (2023). "'Undue hardship' is shown when a burden is substantial in the overall context of an employer's business." Id. at 468.

"The undue hardship inquiry must take into account the context of the particular employer's business and the nature of operations. . . . Considerations include not only direct economic costs, but indirect ones related to health and safety." Together Emps., 573 F. Supp. 3d at 435 (citations omitted). An employer's legitimate safety concerns are relevant considerations in the undue hardship analysis. See Draper v. US

[13]

Pipe & Foundry Co., 527 F.2d 515, 521 (6th Cir. 1975).  It likewise imposes an undue burden to require an employer to relieve an employee of her essential job functions and assign them to another employee.  Bruff v. North Miss. Health Servs., Inc., 244 F.3d 495, 500 (5th Cir. 2001).  Reputational effects on an employer can also impose an undue hardship.  Cloutier, 390 F.3d at 136.

Under these precedents, the Court concluded that the accommodations Antredu requested would have resulted in undue hardship for the Department.[3]  Antredu's position included in-person, one-on-one interactions with both youth, their families, and other employees.  Antredu was also required to, when necessary, physically restrain youth; such close contact with clients would certainly have increased his risk for spreading COVID-19.  Unvaccinated, Antredu would put his colleagues, clients, and their families at a higher risk for contracting

---

[3] Antredu argues that because the Department did grant four religious exemptions to the vaccination requirement (out of 66 requests), the Department's position on undue hardship "is defeated."  Pl.'s Opp'n. Mot. Summ. J. 9, ECF No. 46.  Antredu, however, has failed to demonstrate that the positions in which the four exempted employees worked posed the same burdens on the operations of the Department.  It is possible, for instance, that those employees had administrative positions that allowed for them to work from home, protecting their coworkers.  The Court, therefore, rejects this argument.  The undue hardship analysis is a fact-specific inquiry; the exempted Department employees may have (and likely did) work in positions that allowed the Department to accommodate their requests.

COVID-19.  The Department may have also lost the confidence of some clients were they to learn that Group Workers were working with youth while unvaccinated.  Antredu's requested accommodation would have substantially burdened the Department.  The Department, therefore, met its burden in demonstrating that the requested accommodation would have been an undue hardship, and that therefore, it was justified in terminating Antredu's employment.

**IV.   CONCLUSION**

The Department's motion for summary judgment, ECF No. 36, was **GRANTED**.  The Court concluded that although Antredu demonstrated a sincerely held religious belief, the burden on the Department in accommodating that belief would have been too great.

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.